# JOHN HAMLON
## v.
## FANNY SULLIVANT.

1. CORRECTING WRITTEN LEASE—MISTAKE.—In order to maintain an action for the correction of a written contract on the ground of mistake, the mistake must be mutual. Rectification can only be had when both parties have executed an instrument under a common mistake, and have done what neither of them intended.

2. EVIDENCE MUST BE CLEAR AND SATISFACTORY.—A deed will not be

reformed by decree of a court, so as to make it express something entirely different from what is written on its face, except upon evidence of the clearest and most satisfactory character; such as to leave no fair and reasonable doubt upon the mind as to the intention of the parties.

APPEAL from the Circuit Court of Ford county; the Hon. OWEN T. REEVES, Judge, presiding. Opinion filed October 24, 1882.

Messrs. KINNEAR & MOFFETT, for appellant; that the mistake must be mutual, cited Nevins v. Dunlap, 33 N. Y. 676; Ledyard v. Hartford Ins. Co. 24 Wis. 496; Kent v. Manchester, 29 Barb. 595; Lyman v. U. S. Ins. Co. 17 Johns. 377; Coffin v. Taylor, 16 Ill. 457; Sutherland v. Sutherland, 69 Ill. 482.

Mr. A. SAMPLE, for appellee.

DAVIS, P. J.   On the nineteenth day of February, 1879, an indenture was entered into between appellee, of the first part, and appellant, of the second part, substantially to the effect that appellee had demised, leased, and to farm, let to appellant all the plow-land on the north half of section nineteen in township twenty-four north, range nine, east of third P. M., 240 acres, more or less; to have and to hold the same, to appellant, from the first day of March, 1879, for and during and until the first day of January, 1881.   Appellant on his part covenanted with appellee to pay her, as rent for said premises, $400, payable, one half, or $200, on the first day of August, 1879, and one half, $200, on the fifteenth day of December, 1879.   He also covenanted to pay all taxes assessed on said land for the two years 1879 and 1880, and deliver the tax receipts to appellee by June first of each year, and to pay ten per cent. interest on the $200 from the first of July, 1879, to first of August, 1879.

The lease was written by appellee and was signed and sealed in duplicate by both of the contracting parties.

Some time after the execution of said lease appellee demanded in writing from said appellant payment of rent of said premises for the year 1880, and appellant refused to pay rent for said year.

Hamlon v. Sullivant.

Appellee then filed her bill of complaint in chancery, charging that she made a contract with appellant for the leasing of said lands described in said lease, from March 1, 1879, to January 1, 1881, appellant to pay her for the same the sum of $400 for each year: $200 on August 1, 1879, and June 1, 1880, and $200 on the 15th of December of each of said years, and the taxes, and deliver tax receipts by June 1st of each year, and to pay ten per cent. interest on the $200 due August 1, 1879, from July 1st until August 1st, and that appellant and appellee were to sign a lease for said premises. The bill further charges that a lease was executed by the parties, embodying the contract as entered into between appellant and appellee, except that the $400 rental for the year 1880 was by mistake omitted and was not inserted in said lease. The prayer of the bill is that the said lease may be corrected and reformed so that it may express in writing the real and true intent and agreement of the parties thereto, and that said $400 rental for the year 1880 of said premises, $200 payable on the 1st day of June, 1880, and $200 on the 15th of December, 1880, may be decreed to be a part of said lease, and that complainant may have thereunder her usual and proper remedy for the collection thereof.

Appellant in his answer, not under oath, oath being waived, denies that he was to pay a cash rent of four hundred dollars for each of said years, and denies that there was any mistake made in the stipulations and conditions in the lease of said lands, and denies that there were any other stipulations or conditions in the agreement for the leasing of said lands for said term other or different from the provisions and agreements set forth in said lease, and denies that he was to pay any rents for said lands other or different from the terms of said lease, and charges the fact to be that the lease contains the true agreement as to the leasing of said lands for said term, and that no mistake was made in the terms, provisions and conditions of said lease.

The cause was referred to the master to take testimony and report, and on the hearing the court below found that there was a mistake made in the execution of said lease on the part of both said appellant and appellee; that the contract of leasing

is truly described in the bill of complaint, and that the rent for said premises according to the contract as made and understood by said parties was four hundred dollars per year and the taxes, as set forth in said bill of complaint, and it was decreed by the court that the said contract of leasing be reformed and corrected so that the said lease shall read "four hundred dollars per year."

To reverse this decree appellant prosecutes this appeal.

The law governing such cases is very plain and is not disputed by the parties.

The mistake must be the mistake of both parties; in other words, it must be mutual.

The instrument sought to be reformed must have been so written as not to state correctly the contract as entered into and understood by the contracting parties.

"Rectification can only be had where both parties have executed an instrument under a common mistake, and have done what neither of them intended. A mistake on one side may be ground for rescinding, but not for correcting or rectifying an agreement." Emery v. Mohler, 69 Ill. 222; Sutherland et al. v. Sutherland et al. 69 Ill. 432, and authorities cited.

The only question presented by the record, then, is one of fact, whether in writing the lease a mistake was made, whereby a contract was set out different from the one actually entered into by the parties.

It seems from the evidence that the north half of section 19 is wet and at least sixty acres of it can not be farmed to advantage unless seeded down to meadow and pasture, and the plow-land is surrounded by sloughs, which run through it in different places. About eighty acres of the N. W. quarter is slough. There is not much difference between the N. E. and N. W. quarters. The land was heavily mortgaged, the debt maturing January 1, 1881.

About the 16th of December, 1878, the first interview between the parties about the renting of the land took place. Appellant and a man by name of Krumri saw Mrs. Sullivant. They proposed to give one third of the crops. She asked if they would take it for interest and taxes if she would get

the interest cut down to eight per cent. They did not want to pay money rent at all, but the one third. Appellant said that if he paid cash, he would have to have it at a very low rent. Mrs. Sullivant asked Hamlon if she would write and get the interest reduced to eight per cent. if he would take it for five or ten years. He replied if he could get it that way, so that he could seed down the low land, he would take it for five years, and pay interest at eight per cent. and taxes, but for no less time, as it would not pay to seed it down. She said she would write and tell them if they would not reduce interest to eight per cent. so he could have it for a term of years, she would let it go back and be sold under the mortgage, as she had no other way of supporting it, and she would let him know in three or four weeks. No contract was entered into between the parties at this interview, and early in February, 1879, she sent her son, Michael L. Sullivant, to tell appellant he could not have the land for five years.

No other interview was had between appellant and Mrs. Sullivant about the land or with reference to renting it, until after the meeting between Hamlon and young Sullivant, when the latter delivered his mother's message to appellant.

The contract of renting and the terms upon which the land was rented, and the duration of the lease, were fixed, if they were fixed at any time, at this meeting between Hamlon and young Sullivant.

This meeting was two or three weeks before the lease was made, and the son thus testifies for appellee as to what took place:

" I went to see Hamlon two or three weeks before the lease was made, to tell him he could not have it for five years. Went but once. He was at home when I saw him. Went to Melvin and returned with him in his wagon leading my horse. Told him we had no right to lease longer than loan run. The agent would not guarantee extension. My business was to tell him he could not have it for five years. Wanted him to take it for two years on same terms. Said he would not. Will not say he did not tell me he would not

take it for less than five years because, to make it pay, a large portion would have to be put to meadow. He did say he would not take it for two years and pay interest and taxes each year. Asked Hamlon to go over the land with me to see if there was any money in holding it. Wanted to see if there was any money in it. Had never been over it. Had not been paying its way on account of losing Jackson rent, and paying ten per cent. and high taxes. When we got middle way over it quite likely I said, 'Let us turn back; I do not care about getting drowned—there is no money in the damned land anyway.' It was late and cloudy, and had ten miles to go, and did not care to measure sloughs then. Will not swear Hamlon wanted me to go over the northwest quarter and rent it to Frank Phillips. When we got back near the school-house, asked Hamlon what was the best rent he would give for the plow-land on half section for two years. He said one third in Melvin. May have said the land could lie idle first as we wanted cash. Did not say that five years before we rented for grain and got not over $200 and taxes. Knew that first yesterday, as I was away at school and only home vacations. Very likely I told Hamlon at school-house in regard to the whole thing that this land would have to rent for cash, though it was a small cash rent, else it would go back or lie idle. We did not then agree on the rent."

"Did not you say to Hamlon at or near the school-house, 'Now, John, will you give me $400 and pay the taxes on this land for two years,' or in substance that?"

Answer. "I may have made such a statement, not meaning he should have the ground for the $400 for the two years, because I knew the interest was $400 a year."

"Will you swear you did not say that to him?"

Answer. "I will not swear that I did or did not say he could have it for $400 for the two years. Think Hamlon replied he would prefer to give one third crop. Said I would not take it. Don't think I said then I would rather it would lie idle than take one third of crop, but did so state to him in some of our conversation that day. Hamlon might have understood me that he could have the land for $400 for two years, I meaning to convey no such idea. Next saw him when lease

was made.   Have no remembrance of his saying then: 'Well Mike, I have come to the conclusion to take you up at the offer you made at the school-house.'   Said he had made up his mind to take the ground.   I said, 'Mother, get a blank and make out the lease.'   Don't know, don't remember if mother said: 'Mr. Hamlon, what was the bargain between you and Mike?'"

"Will you swear positively she did not use those words?"

Answer.   "No, I will not swear positively.   I do not remember.   Mother drew the lease."

Appellant, who was the only other witness who had any personal knowledge of the facts of the renting and of the agreement of the parties, testified as follows:

"Rented the N. E. quarter of this land in '77 for $345, cash, and in '76 for grain.   In '78 rented the plow-land on the half section for cash.   In 1874 leased the N. E. quarter for two years for breaking, and after that was to have it for one third of the crop until sold.   Paid the rent of '78 in September, '78, before due.   Her son, Mike, wrote and signed the two receipts for it under her directions.   Told them there was no use talking; I would pay no such rent again; that it would take half my crops.   Then came up the ditch question—they wanted to know if it could be ditched.   I told them, as I had done before, that there was no use until others ditched, there being no outlet.   Then she asked me about taking it for a term of years and ditch it.   Told her if I ditched would want the use of it at least five years.   Next time I saw her was December 16 or 17, 1878, the time Krumri and I were there.   We offered one third crop, delivered in Melvin, and she claimed she did not want to rent for grain.   Told her there was no use talking, I would not pay such cash rent as I had been paying.   Mrs. S. asked me if she would write and get interest reduced to eight per cent. if I would take it for five or ten years.   Told her if I could get it that way, so I could seed down the low land, I would take it for five years and pay interest at eight per cent. and taxes, but for no less time, as it would not pay to seed it down.   She said she would write and tell them that the party on the land had a hard time paying rent and if they would not reduce interest to eight per cent. so he could have it

for a term of years, she would let it go back and be sold under the mortgage, as she had no other way of supporting it. Was to let me know in three or four weeks. Nothing was said about my taking it for two years if she got the interest reduced, and pay interest and taxes each year, or for the time the mortgage was to run; nothing said about my taking it for five years and pay interest and taxes and ditching. I was to take it five years and pay interest and taxes if she got interest reduced. She said if I did not take it that way, she expected it would go under the mortgage. The ditch talk was when I paid the rent. (September, '78.) She said she preferred to rent to me because I was responsible and would pay the rent. Young Mike came to my place last of January or first of February and told me I could not have the land five years as talked in December. He then asked me if I would take it for two years on same terms. Told him no. There was no use talking two years, as I could get no benefit by seeding. My son and Wm. Baker were there; told them in Mike's presence that I could not get the land for five years, but Mike wanted me to take it for two years for interest and taxes. I refused to do so, and told them that Mike wanted me to go over the land, and Mike replied, ' Yes, I want to see if there is any use in holding it or not.' We went out over it on horseback. Mike was anxious to select a good eighty or quarter out of it. Told him I did not know any way he could cut it up to make any choice. Did not say why he wanted this, but said he did not think there was any money in holding the land. When half way across the land; I wanted him to go to Phillips, and let him and Sands have the N. W. quarter. We started to go across the big slough. Mike said, 'No, I am not going to run the risk of my drowning in that slough. D—n the land, there is no money in it; let us turn around and go back.' We went back to a knoll west of school-house and stopped. He wanted to know the best rent I would give. Told him, one third delivered in Melvin and I would furnish crib room on my place. He said he would take no share; the land might lie idle first and go back under mortgage. He studied awhile and said, ' Well, John, will you take the land for $400 and pay the taxes for two years?' Told him I would rather give one third.

Hamlon v. Sullivant.

He said nothing about my taking the land for two years and pay $400 each year and the taxes. The proposition he made when he started away was this: ' Now, John, will you take this land and pay me $400 for two years and the taxes?' He said that was the least they would take. Before this I had refused those terms. Waited until February 19th to see if they would take one third of the crops. I went over and told them I would take the land at the offer Mike made at the school-house. Mike said, ' All right, mother, get a blank and draw contract.' She got one, sat down and wanted to know the bargain between Mike and me. I told her it was $400 and taxes for two years. She wrote till she came to paying the rent, when she asked me when I could pay first half. Said she wanted it in July. I said it was too soon. She said she had to raise money then and knew no way of getting it unless she borrowed at ten per cent. Told her I would allow her ten per cent. from July to August. Wanted the other half Dec. 15, '79. Told her I could pay it then. Agreed that taxes might run to June, '79 and '80. That was all that was said until contract was done. I told her to hand it to Mike for him to read it aloud and he did so. I said it was just as we agreed at the school-house, and he stated it was all right. We then signed it. The lease is written just as Mike and I talked at the school-house, and as I told Mrs. S. I was to have it."

Mrs. Sullivant in her testimony says: "Hamlon and Krumri saw me in December, 1878, about renting; wished to pay one third in Melvin. Mr. Sullivant declined grain rent, and Krumri had no more to say. Mr. Sullivant told defendant he could have it for $540 or a little more; more was needed to pay ten per cent. interest on $5,000 and taxes—taxes from $60 to $80 per year. Hamlon said interest was too high; should get lower rate; 340 acres in half; estimated plow-land 240 acres. Said he could not ditch the wet land for its use for less than five years. As loan expired in two years, could not lease for five. Then discussed his taking it two years, or till loan matured, and asked him to take it and pay interest and taxes each year. He would not pay $500 interest, and if he took it interest must be reduced to eight per cent., or $400 per year.

Would take it that way and pay taxes. I was to write for rebate of interest and five years' time. I preferred this, and would get ditching done and make the land more salable. Bargain not made then. Told him the land must pay interest and taxes—had no outside means—else would have to give it up and let it go under the mortgage. Would let him have it for interest and taxes; he had paid $345 for half, and I could not afford to lose a cent on it. Wrote agent for reduction of interest, which was allowed if paid promptly. February 6, 1879, sent my son to tell Hamlon he could not have the land for five years, but could for two, for interest and taxes each year. February 19th, Hamlon came to make lease. Had never made one, but had filled in perhaps a dozen under Mr. S.'s directions, in fall of 1878, as he had no clerk; these were for grain rent, one year at a time. In writing first lease, when I came to where payments were to be filled in, wanted him to meet the first half rent per year on July 1st, as interest was due then. Said he could not, but that if I would meet it he would pay me interest from then to August 1st. Told him he must meet it the next year promptly; wanted no responsibility; was why I rented so cheap, knowing he was responsible and could meet his engagements. Had written in first lease $400 per year, payable August 1st and December 15th; read sections as I went along. My son said, 'you don't want second year's payment August 1st, but July 1st.' Threw that aside and began another and wrote it as appears in lease —$200 payable August 1st, and $200 December 15, 1879. Hamlon was still unwilling to say that he would meet interest on July 1, 1880, and left it blank for him to decide. He concluded on July 1st, but if he could not, he wanted same arrangement as for 1879. Next talked about the high taxes, and when finished, I read lease aloud—either Mike or I did. In talking about the taxes being so high, and he refusing to pay them for 1879, I neglected to put in dates of payments for second year; wanted him to pay taxes each year, as I wanted nothing to do with it. Said he would pay taxes for 1880 and 1881. Supposed second year's payments were in when the lease was signed. Verbal agreement was to pay for second

year $200, July 1st and August 1st; last payment to be made in time to meet interest due January 18, 1881. My son or I read the lease aloud to Hamlon, and nothing wrong was suggested."

The foregoing embodies all the material evidence bearing on the question involved. A few witnesses testified as to alleged admissions made by Hamlon, but in view of the other testimony, we do not consider such admissions as entitled to much weight.

The law is, that a deed will not be reformed by the decree of a court so as to make it express something entirely different from what is written upon its face, except upon evidence of the clearest and most satisfactory character. Palmer v. Converse, 60 Ill. 314.

And the evidence must be such as to leave no fair and reasonable doubt upon the mind, that the instrument does not embody the final intention of the parties. Sutherland et al. v. Sutherland, et al. *supra*.

We are not satisfied that the evidence in this case is of such clear and satisfactory a character as would justify us under the rule in reforming the lease.

To determine whether the lease should be reformed, it becomes necessary first, to ascertain what was the contract really entered into by the parties, and then whether the contract so entered into is the same as that set out in the lease.

After a careful examination of the evidence we are unable to say whether the contract entered into was as claimed by appellee or as claimed by appellant. They both testify apparently with equal fairness and honesty, but their evidence is as conflicting as it well can be. Portions of it rather lead us to the opinion that there was a mutual misunderstanding between the parties as to the contract, each supposing it was as each desired it to be. This misunderstanding probably grew out of the fact that what passed between Hamlon and young Sullivant at the school-house was not understood alike by both of them; for the latter swears that "Hamlon might have understood me that he could have the land for $400 for the two years, I meaning to convey no such idea." It is only upon

this supposition that the testimony can be reconciled with the truth and honesty of the parties. Be that as it may, we are satisfied that appellee has not made out her case by that clear and satisfactory evidence required by law. The decree therefore must be reversed and remanded.

Decree reversed.